Case number 15-3092. United States of America v. Anthony Marie Suggs, also known as Applejack Appellant. Mr. Proctor for the appellant, Ms. Heffernan for the appellee. Good morning. Good morning, Your Honor. My name is Gary Proctor and I represent Anthony Suggs. This is an appeal following the denial of 2255 when the district court granted a certificate of appealability. There are not one, but we submit two issues that went to the trier of fact, in this case the jury, that should not by this court's decisions have gone to them. And really, I don't believe we're here to tread any new law. The reason we're here is to decide whether the district court got the finding of a lack of prejudice correct. The way I've been looking at this case, it's like three legs of a stool. The first leg being the truck bug that this court subsequently said in Lanell Glover was constitutionally inadequate in that the truck was at all times not in the District of Columbia. The second leg being Agent Bevington, he testified eight times during a nine day trial, was not ever qualified as an expert, and testified that he had listened to all of the recordings, some two and a half thousand of them, while only 80 went to the jury. So, when you strip those two out, it is my position that what remained was not, and could not, unlike the harmless error. And so for that reason, appellant believes a new trial should have been granted. Do you think all of Agent Bevington's testimony was invalid? No, no ma'am. Under the Hampton Theory, how much of it was invalid under the Hampton Theory? Well, we cited four specific incidents in our brief in the court below, but it's really hard to put your finger on it exactly because it's so pervasive throughout the whole trial. Well, what are we supposed to do? If you can't put your finger on an exam exactly and only provide four instances, what are we supposed to do in trying to determine how many other instances, if any, there were in evaluating prejudice? I'm just not sure what we're supposed to do with the fact that no more than four were identified. That, I understand the court's point. Reading the transcript in its entirety gives a good flavor, but even those four instances we would submit are enough to show there, you know, terms like Trey, he's saying, you know, equals 3,000, piano equals a grand. But the district court went through pretty carefully and said as to some of the things that he said like that, there was sufficient explanatory information given to the jury to evaluate it. So not every time he used interpretive words did he trigger a Hampton problem. Do you disagree with that? No, I do disagree with that because, you know, when you look at the last word the prosecutor said in closing argument before the case went to the jury was, when you listen to these calls in context, it's quite clear what they were saying. The only person that provided that context was Agent Bennington. The only person that had listened to the 96.8% that were not introduced to the jury was Agent Bennington. So we disagree with that because given that his imprimatur as a law enforcement agent, given that he got on the stand almost every day of trial for one reason or another, the import of his words, the weight of his words could not have been lost upon the jury. And then coupled with that, the truck bug evidence. There were five truck bug tapes played and three of them concerned Mr. Suggs. And on those truck bugs, one of them an example of Mr. Suggs. And again, the government in closing argument says, this is when you know, this is how we know what they're talking about. They weren't worried about being surveilled. They actually spoke in plain terms. One of the truck bug conversations was about should we give him the old water or the new water, which didn't take a rocket scientist to figure out. He was asking about the PCP he had recently received or the old PCP that he had purchased sometime earlier. So with that not coming in and Agent Bennington testimony, what's left is not enough to sustain a conviction. I didn't see an argument in your brief about exactly what came in through the truck evidence. I know it was prejudicial. You just sort of say there was truck evidence and it was bad. I'm just not sure how we're supposed to apply that. Well, there was certainly it was in the transfer and it was in my brief about the old water versus the new water. I'll have a look while the government speaks and happily tell you in rebuttal. But it was briefed in the court below as well. I mean, you say you should look at page. All you have is 1314. You got about one page on it in your opening brief. And so I guess I'm not understanding the import of your point that it's in the transcript. We're supposed to go read the transcript and decide for ourselves exactly which parts you want to challenge and how they were incriminating and how they were prejudicial without any specific argument. Well, as I say, I know that it's in there and I'll find it for you and say it for you. With regard to the old water and the new water, I remember reading that yesterday as I was going through this. And it was summarized very succinctly by the government in closing argument. You know, we all agree in this room that that should not have come into evidence. And if you take that stool light, that leg of the stool light and even half of Agent Paddington's, you're not going to sit on it. And so for those reasons, again, you know, I don't think the case law here is particularly complicated. I don't think we're here to talk about circuit splits, but that the evidence itself would not have been sufficient to sustain a conviction. The other evidence that was properly admitted, there were some phone calls between Mr. Suggs and Ms. Joy. There was a search warrant at the property that was not obtained through anything tainted in this case. But even then, there was a lot of PCP paraphernalia and Mr. Suggs' fingerprint shows up in one of the many buckets. There are some phone calls again after that where they go back and forth about I'm going to take responsibility with Ms. Joy, but that could be interpreted chivalry, whatever you want to call it. So I just think, and I'll find that reference for you, that what's left is not sufficient to sustain a conviction in this matter. Unless the court has any questions, I'll yield the remainder of my time. Thank you. Patricia Heffernan on behalf of the United States. For the court's reference, the reference that counsel is discussing to the truck bug was in his reply brief at page 7 to 8. That's the very first time in the entire litigation that they identified any particular truck bug. There was no identification of any truck bug evidence in the 2255. That wasn't discussed at all. Moving straight to the prejudice problem. The district court said the truck bug evidence was, in its words, quote, highly incriminating. Yes. There were three truck bug conversations. Do you disagree with that characterization? No, we don't. We don't disagree that those were incriminating conversations. Highly incriminating. Highly incriminating. But they were just a snippet of the evidence that was introduced in this month-long trial that included 80-some conversations from Sugg's own cell phone, only four of which counsel identified below as being problematic under Hampton. The district court rejected that characterization. One was expert testimony. One was supported in the room. He gave the jury the basis for his opinions. And on appeal, Appellant doesn't dispute, doesn't challenge the district court's analysis of the four opinions that he identified. And with respect to deficiency, I'm going to move on to prejudice. But with respect to deficiency, I did want to point out that, in fact, counsel did raise a Hampton-type objection below. So the district court's ruling had two bases. First, the objection was raised. It was just unsuccessful. So counsel can't be ineffective for failing to raise the objection because he, in fact, did raise the objection. But the district court was quite clear at trial that you had to, that we're going to go line by line here, that there wasn't going to be a categorical ruling. I agree with that. And so at that point, there were, there was no relevant objection. Isn't that plainly deficient not to have just sort of surrendered at that point? I don't, I don't know that I would, that I'm, I'm reading the district court's statement. I think the objection was raised. The district court was on notice of the objection. She said we were going to go line by line. That put the government to its proof also to consider line by line. But again, again, after that, the person said nothing, even though you would admit that again and again and again and again, Bevington gave entirely illegitimate testimony. I wouldn't agree that again, and counsel hasn't pointed to again and again and again and again. They only pointed to four instances. The district court found the majority of his testimony with respect to the activations was simply to identify the date, the time, and the parties. So, so there, so he, Appellant has not shown that Bevington's testimony. There's also testimony about his knowledge based on listening to a lot of recordings that weren't before the jury. I'm sorry, I, I. Was there also, was there not also testimony about his knowledge based on a lot of recordings that were not before the jury? No, and I wanted to point that out because in Appellant's brief, he, he makes that allegation, and he cites page JA87, which is transcript page, and that transcript is simply Bevington, his initial testimony where he explains for the jury the various steps in the investigation. And at this point, he's discussing how the truck bug worked, how they got into the, they went into the truck and how it's monitored, who monitors it, and he said the administrative agent then reviews the recording. That had nothing to do with opinion testimony. He didn't then go on to say, and Appellant hasn't pointed to a single opinion in this case where Bevington rendered an opinion and said it was based on the entirety of the investigation or having listened to all the calls. That's why this case isn't like Hampton. But moving to prejudice, because I agree that the, the easiest way home in this case, and as Strickland points out, the court can always move straight to prejudice and an ineffectiveness claim. The evidence against Suggs was overwhelming. And the court, all the court needs to look at is the March 27th search warrant and the conversation preceding and postdating the search warrant. That was damning evidence since the district court recognized. The initial conversations where his girlfriend calls and says, you know, you can smell it out here, and he says you can smell it like that, and she says there's a policeman here, and if you know what the smell is, you know what the smell is, and she suspects that it's because the second floor window is open. How would that search, so a search obviously could be evidence to support the possession with intent to distribute and the amounts, but how would that search have supported a conspiracy conviction? Because. Or do you rely on something else for the conspiracy? No, the girlfriend was a named co-conspirator, and her conversations establish her role as a co-conspirator because she is acceding to the storage of this PCP that she knows is in her house. She's protecting it. She's called Suggs to let him know. Is that all you're relying on for the conspiracy? I think. No, no, no, no, no. I'm saying with respect to that March 27th incident, there's also lots of other evidence in the case. I'm just saying the shortest, cleanest. Tell me about some of your other evidence supporting conspiracy. His involvement with the various co-conspirators, his phone calls with Lionel Glover, who was receiving the large amounts of PCP, his involvement in the Parker controlled sale. James Parker goes to make a controlled sale with a co-operator. In the beginning of the sale, he says he needs to make a phone call about the Glo. The pen register shows him making a phone call to Suggs. The sale is completed later that day. He arrives at the scene driven in Suggs Tahoe, and he leaves the scene after the sale in Suggs Tahoe. There's a January sale that Suggs makes to a controlled sale that he makes after a meeting with Lionel Glover. There were lots of conversations. If you look at the bulk of the conversations, especially with Price, but the other co-conspirators also, where they're constantly discussing how they need to get something from Suggs. He's laying on Cuz. He's waiting. He'll hit them back when he gets whatever it needs they're looking for. The only question is what it was they were discussing. There's PCP found in Ernest Glover's house, another co-conspirator who he had been dealing with and talking with on the phone. You just said the only question was about what they were talking about, what all the code words meant. Doesn't that put us right back in the trouble with Bevington's testimony? Because that was the only source of understanding what they meant on all this evidence. No, because Bevington's interpretation about, say, 16th Street or 32nd Street or a trade, that was expert testimony that this Court has already said was not problematic. What was his defense at the initial trial? To be honest, Your Honor, I haven't reread the transcript since I did the direct appeal, so my hazy recollection was it didn't really show whose PCP it was in the house. Did he introduce evidence at the initial trial? Not that I recall. Okay. But, again, I didn't reread the entire transcript before preparing for this argument. But in any event, so I would submit to the Court that just looking at the March 27th evidence, that alone supports the conspiracy and the PUID without having to look at all the other evidence. But we have summarized that in our brief and in our brief in the direct appeal. And the district court held an appellant didn't really meaningfully challenge her conclusion after a very thorough analysis that the evidence in this case was overwhelming,  I just want to clarify one thing as to he identified four instances he was challenging for Bevington testimony. The district court found two of them to be invalid under Hampton, correct? No, I think what she said was they were debatable. She said there were two of them, you dead now. So I'm moving to the third. The first two she found, no Hampton error. The third she said they said were debatable at best. And then she described them. The one opinion was. Debatable at best against you. No, I think it was debatable at best against him. I think that she was skeptical whether they were Hampton error because then she went on to say. Let's assume they were actually Hampton error. Okay. Is it your position that his initial objection before she said let's go line by line was sufficient to preserve a challenge to those? We wouldn't dispute that. We wouldn't dispute that. I mean, even if the court looked at. No, no, no. I'm asking what your position is on what it takes for a defense attorney to adequately preserve an objection to testimony. So assume that's Hampton error. And he does this upfront objection. The district court says, look, we're going to go through this line by line. I'm not going to make some categorical ruling. And then the attorney says nothing. I thought you just said that you would deem that objection to be sufficient for subsequent testimony that was ran afoul of Hampton under my hypothetical scenario. Is that correct? I think I would have to say, you know, if we were on direct appeal and we were considering that, I would not dispute with the court that that objection was preserved. We only really the court. We were just pointing out that it was raised initially. I haven't gone because counsel didn't point to anything other than those four opinions. I have not gone back. I'm just trying to see whether the two debatable ones look anything else. So moving on to those two substantive. So those who never the trial attorney didn't object. Other than that, up front one of the district court said, I'm not going to give you that categorical ruling. We're going to do this line by line. And then the defense attorney stand stood silent after that. And your position is that direct appeal or collateral collateral review either way. That was a sufficiently preserved objection to those two debatable Hampton errors. He did not specifically challenge those. I get that. So I'm asking. So we would. So I will concede that that he did not object to those. We think the district court was right in saying that standing silent as to those two pieces of evidence was not did not render his performance. So constitutionally deficient that he wasn't acting as counsel as contemplated under the Sixth Amendment. And she said that it was debatable at best as to whether those were Hampton errors. And, you know, again, my question was assume that they are plain Hampton errors. I know you disagree. And just assume they're plain Hampton errors. Then would it be deficient? I'm trying to figure out when she's when you say it's not deficient. Is it because it was fine? We did an upfront objection. Or was it not deficient because they were debatable? They were debatable and marginal at best. And there was no prejudice. Isn't that your stronger position that there was no. I think that's that's definitely the easiest way to resolve the case for sure. We assume for purposes of this decision that it was an inadequate performance on the part of counsel. It still was no harm because the evidence was overwhelmed. That's correct. You can assume that and move on to no prejudice holding. There are no further questions. We'd ask that the judgment be affirmed. Thank you. I can tell from the court's questioning you reviewed everything. And I'd like to thank the government for pointing out where the truck bug was in the underlying brief. I just wanted to point out briefly one of the conversations that the court said was not a Hampton error. It concerned a phone call where my client said, where's the effect of I should have the apartment cleaned out one day this week. Which agent Bennington testified through facts learned during the course of investigation meant there will be PCP for sale next week. And I just for the life of me can understand on the evidence before the jury. Other than all of these other calls that were never introduced that were never played. But he testified to that. He understood it and listened to it and reviewed how he could make that inferential leak. So for that reason, I do believe a Hampton error did occur. And I think everyone agrees that a truck bug error occurred. And the only question for this court is what remains after you've got the vast majority of. What remains is a prejudice argument. The judge sent all referenced. And what is your best argument on that? That if you just look at these things with it, for example, there was a gentleman. The jury hung Glendale Lee, who went to retrial, who was not really affected this way. Ultimately, they acquitted him. What's left is not enough. You have him being kind of sort of tied to an apartment. Agent Bevington says that he saw that he went there a few times. Or he believed he resided there based on some phone calls. But, you know, there's not. They come in. They find $7,000 in my client's pocket and a receipt from a bank. There's a slew of PCP paraphernalia. But my client's fingerprints is on one of the buckets. It's not on the various jugs that are sitting there. Were there other fingerprints on those items? My recollection is I don't believe so, but I don't know that they tested for anyone else. So. You don't know whether there were any lifts or not, any prints at all on them? I don't recall one way or the other, sir. I'm sorry. So you've got that. And you've got this phone call where he says, they've seen my rack sheet. I'll take the heat for this. You don't have to worry. I'll go see my lawyer. No, he also says this is my stuff. Yeah. Well, he says I'm going to tell them this is my stuff. But, you know, where I trial counsel, I'm quite sure I would be saying that this could be interpreted as chivalry and trying to help a lady charged with a conspiracy out of a jam. So I just don't think when you strip away what shouldn't have come in, what's left. So they find 7.7 kilograms of PCP in the apartment that he occupied with his girlfriend. And then he calls his girlfriend after the search and says, the police know this is my stuff. This is my stuff. Well, again. And that's not enough? It was a debatable question whether that was his apartment. The testimony was somewhat equivocal. If it's a debatable claim, it means there was evidence of it, right? There was some evidence that he went there. But there was no evidence that he had, you know, the stuff you commonly expect to see. Cell phone registered to that address. Lease in his name. It was a girlfriend, not a wife. So, you know, there were things that a defense lawyer could have said. Yes, sir. That, I think. All right. Mr. Proctor, you were appointed by the court to represent Mr. Suggs in this case. And the court thanks you for your assistance. The case is submitted.
judges: Millett, Sentelle, Randolph